No. 25-2033

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

————————————

GARY ROEMER,

*Plaintiff-Appellant,*

v.

BOARD OF REGENTS OF NEW MEXICO STATE UNIVERSITY; DAN ARVIZU; DONALD CONNER; ANNAMARIE DELOVATO; ROLANDO FLORES; MATTHEW GOMPPER; LAURA CASTILLE, individually and in their official capacities,

*Defendants-Appellees.*

————————————

On Appeal from the United States District Court
for the District of New Mexico
No. 2:22-CV-00524-JB-SCY
(Honorable James O. Browning)

BRIEF OF *AMICUS CURIAE*
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL

ROBERT CORN-REVERE
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@thefire.org

Counsel for *Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amicus curiae* Foundation for Individual Rights and Expression certifies that (1) *amicus* does not have any parent corporations, and (2) no publicly held companies hold 10% or more of the stock or ownership interest in *amicus*. *Amicus* is a nonprofit corporation exempt from income tax under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3).

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES ................................................. iii

INTEREST OF *AMICUS CURIAE* ............................................1

SUMMARY OF ARGUMENT ................................................3

ARGUMENT ................................................................6

I.    Unconstitutional Speech Codes in Higher Education Are a Problem Both Nationally and In the Tenth Circuit........................6

II.   The Supreme Court Has Provided the Constitutional Standard for Discriminatory Harassment Policies.......................11

III.  The District Court's Attempt to Save ARP 3.25 Only Highlights Its Unconstitutionality ................................13

    A.    The District Court misunderstands the objectivity standard. .................................................14

    B.    The District Court's own example of prohibited speech under ARP 3.25 blatantly violates the First Amendment.................................................17

IV.   Facial Challenges Are Important to Ensure Government Does Not Unlawfully Chill Speech.........................................20

CONCLUSION .................................................................22

# TABLE OF AUTHORITIES

## Cases

*Bair v. Shippensburg Univ.*,
280 F. Supp. 2d 357 (M.D. Pa. 2003) ...............................................13, 20

*Booher v. Bd. of Regents*,
1998 U.S. Dist. LEXIS 11404 (E.D. Ky. July 22, 1998) ......................13

*Corry v. Leland Stanford Junior Univ.*,
No. 740309 (Cal. Super. Ct. Feb. 27, 1995) .........................................13

*Dambrot v. Cent. Mich. Univ.*,
55 F.3d 1177 (6th Cir. 1995)..................................................................13

*Davis v. Monroe County Bd. of Education*,
526 U.S. 629 (1999)..........................................................................11, 12

*DeJohn v. Temple Univ.*,
537 F.3d 301 (3d Cir. 2008) ......................................................12, 13, 20

*Doe v. Univ. of Mich.*,
721 F. Supp. 852 (E.D. Mich. 1989) ...............................................14, 20

*Healy v. James*,
408 U.S. 169 (1972).............................................................................5, 21

*IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
993 F.2d 386 (4th Cir. 1993)...................................................................19

*Kansas Judicial Review v. Stout*,
519 F.3d 1107 (10th Cir. 2008)........................................................13, 20

*Kolender v. Lawson*,
461 U.S. 352 (1983)..................................................................................13

*New York v. Ferber*,
458 U.S. 747 (1982)..................................................................................20

*Papish v. Board of Curators*,
410 U.S. 667 (1973)..................................................................................18

*R.A.V. v. St. Paul,*
  505 U.S. 377 (1992) ........................................................................18, 19

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) ................................................................................18

*Roberts v. Haragan,*
  346 F. Supp. 2d 853 (N.D. Tex. 2004) ...................................................13

*Russello v. United States,*
  464 U.S. 16 (1983) .................................................................................16

*Shelton v. Tucker,*
  364 U. S. 479 (1960) ................................................................................5

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,*
  502 U.S. 105 (1991) ................................................................................18

*Spectrum WT v. Wendler,*
  No. 23-10994, 2025 WL 2388306 (5th Cir. Aug. 18, 2025) ..................19

*Sweezy v. New Hampshire,*
  354 U.S. 234 (1957) ................................................................................21

*UWM Post, Inc. v. Bd. of Regents of the Univ. of Wis. Sys.,*
  774 F. Supp. 1163 (E.D. Wis. 1991) ................................................14, 20

## Regulations

85 Fed. Reg. 30026, 30033 (May 19, 2020) ............................................12

## Other Authorities

Bob McGovern,
  *Attorneys: Babson will not punish pro-Trump duo for Wellesley ride*, BOSTON HERALD (Nov. 17, 2018, at 12:00 AM ET) ........................8

FIRE,
  SPOTLIGHT ON SPEECH CODES 2025 1 (2025) ..........................................6

N.M. STATE UNIV., ARP 3.63 – Freedom of Expression, Part 5:
  "Policy Statements," last updated Oct. 21, 2015 ....................................3

Peter Bonilla,
    *FIRE Letter to University of Kansas*, FIRE (Feb. 3, 2016) .................10

*Prof Returns to Class after CU 'Harassment' Claim Fails*, FIRE
    (Jan. 10, 2014) .......................................................................................10

Sarah Kuta,
    *CU-Boulder: Patti Adler could teach deviance course again if it
    passes review*, DAILY CAMERA (Dec. 17, 2023, at 13:04 MST) ...............9

Scott Jaschik,
    *Too Risky for Boulder?*, INSIDE HIGHER ED (Dec. 15, 2013) .................8

The Associated Press, *University says sorry to janitor over KKK
    book*, NBC NEWS (July 15, 2008, at 07:49 ET) .....................................7

Tim Cushing,
    *University of Oregon Slaps Student With Five Conduct Charges
    Over Four Words*, TECHDIRT (Aug. 28, 2014, at 12:45 ET) ...................7

UNIVERSITY OF COLORADO BOULDER SOCIOLOGY DEPARTMENT AD
    HOC COMMITTEE TO REVIEW THE COURSE, REPORT - AD HOC
    COMMITTEE TO REVIEW DEVIANCE COURSE MATERIALS 2 (2013) ...........9

*Victory: University of Kansas Professor Reinstated After Four-
    Month Investigation Into Classroom Speech*, FIRE (Mar. 21,
    2016) ......................................................................................................10

## INTEREST OF *AMICUS CURIAE*[1]

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the most essential qualities of liberty. Since 1999, FIRE has successfully defended the rights of individuals through public advocacy, strategic litigation, and participation as amicus curiae in cases that implicate expressive rights under the First Amendment. *See, e.g.*, *Amicus Curiae* Br. FIRE Supp. Pl.-Appellant, *Parents Defending Educ. v. Olentangy Local Sch. Dist. Bd. of Educ.*, No. 23-3630 (6th Cir., filed Dec. 23, 2024); Br. FIRE Amicus Curiae Supp. Pl.-Appellant, *Cunningham v. Blackwell*, 41 F.4th 530 (6th Cir. 2022); Br. FIRE Amicus Curiae Supp. Neither Affirmance Nor Reversal, *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021).

In June 2022, FIRE expanded its advocacy beyond the university setting and now defends First Amendment rights both on campus and in society at large, representing represents plaintiffs, without regard to the

---

[1] No counsel for a party authored this brief in whole or in part. Further, no person, other than *amicus*, their members, or their counsel contributed money intended to fund this brief's preparation or submission.

1

speakers' political views, in lawsuits across the United States. FIRE also continues to engage in litigation regarding our nation's college and university campuses, and regularly files briefs as *amicus curiae* to ensure that First Amendment rights are vindicated when violated at public institutions like New Mexico State University. The faculty and students FIRE defends rely on access to federal courts to secure meaningful and lasting legal remedies to the irreparable harm of censorship. If allowed to stand, the District Court's ruling will erode the academic freedom and First Amendment rights of faculty and students nationwide by encouraging public institutions to further silence dissent through vague and overbroad policies that chill campus speech.

## SUMMARY OF ARGUMENT

Universities across the country regularly express their commitment to the right to free expression. New Mexico State University is no exception, proclaiming that "Free exchange of ideas is a reflection of the university's public land-grant heritage, interest in diverse points of view, and commitment to excellence in education and research." N.M. STATE UNIV., ARP 3.63 – Freedom of Expression, Part 5: "Policy Statements," last updated Oct. 21, 2015, https://arp.nmsu.edu/chapter-3/3-63.html [https://perma.cc/Y6RH-SGN6]. Professor Gary Roemer had every right to expect that kind of "free exchange of ideas" in August 2020, when he penned a civil and thoughtful reply to a campuswide email from then-Chancellor Dan Arvizu about the police shooting of Jacob Blake and resulting riots in Roemer's hometown of Kenosha, Wisconsin.

But at NMSU, and at far too many other institutions of higher education in the Tenth Circuit and nationwide, the liberty they claim to protect with one hand they take away with another. As Roemer found out, NMSU does this through two other policies: ARP 3.25, its antidiscrimination policy, and ARP 3.80, its anti-bullying policy, which

through vagueness, overbreadth, and not a little confusion abridge the First Amendment rights of its faculty members and students.

These violations are entirely unnecessary. The Foundation for Individual Rights and Expression (FIRE) has spent more than 25 years fighting colleges' use (really, abuse) of vague and overbroad discrimination and misconduct policies to silence and chill dissenting voices like Professor Roemer and thousands of other faculty members and students. This silencing is all the less excusable given it has been more than 25 years since the Supreme Court set forth a standard of severity, pervasiveness, and objective offensiveness that balances the requirements of nondiscrimination laws and First Amendment, and nearly five years since colleges were explicitly required by federal regulation to adopt that Supreme Court standard.

Yet rather than apply these standards to NMSU's vague, overbroad, and frankly incomprehensible speech policies, the District Court's gargantuan 222-page opinion spends dozens of those pages crafting tortured interpretations of language and law seeking to paper over their constitutional infirmities. But NMSU's policies are so poorly drafted that the District Court confused itself into presenting a patently

unconstitutional application of NMSU regulations—one which flies directly in the face of more than five decades of legal precedent—as though that application justified those policies.

It is not too much to ask of taxpayer-funded institutions like NMSU that they follow clearly established law when crafting policies that regulate speech on their campuses, which are, after all, a space where the Supreme Court has emphasized that the need for freedom of expression is vital. "[T]he precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, '[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'" *Healy v. James*, 408 U.S. 169, 180 (1972), (*citing Shelton v. Tucker*, 364 U. S. 479, 487 (1960)).

NMSU's students and faculty members deserve better. Indeed, our Constitution *guarantees* better. The Tenth Circuit should reverse the District Court's decision and refuse to shut the courthouse door on those who, like Professor Roemer, are willing to brave the campus chill and stand up for Americans' First Amendment rights.

## ARGUMENT

### I.  Unconstitutional Speech Codes in Higher Education Are a Problem Both Nationally and In the Tenth Circuit

Notwithstanding their professed commitment to students' free-speech rights, public colleges and universities across the country, including NMSU, have adopted policies that prohibit expression protected by the First Amendment. This widespread and long-running problem underscores the importance of the issue in this case.

FIRE annually reviews and maintains detailed records of the speech regulations of nearly 500 of the largest and most prestigious colleges and universities in our nation, and for the last 19 years has issued an annual report on its findings that highlights noteworthy policies and national trends. FIRE's latest report, Spotlight on Speech Codes 2025, reveals that despite FIRE's quarter-century of activism and litigation targeting speech codes, 83.5% of the 490 institutions surveyed continue to maintain policies that either clearly and substantially restrict protected speech or could easily be applied to suppress or punish protected expression. FIRE, Spotlight on Speech Codes 2025 1 (2025), https://www.thefire.org/sites/default/files/2025/07/Spotlight%20on%20Speech%20Codes%202025.pdf [https://perma.cc/UMN8-XQN8].

6

Public and private institutions nationwide regularly investigate and punish protected speech in the name of enforcing policies against harassment and bullying. In 2007, Indiana University-Purdue University Indianapolis found student-employee Keith John Sampson guilty of racial harassment for merely reading the book *Notre Dame vs. The Klan: How the Fighting Irish Defeated the Ku Klux Klan*—silently, to himself. The Associated Press, *University says sorry to janitor over KKK book*, NBC NEWS (July 15, 2008, at 07:49 ET), https://www.nbcnews.com/id/wbna25680655 [https://perma.cc/PRG3-B4RK]. Only after FIRE's successful intervention did the university reverse its racial harassment finding against him. In 2014, a female student at the University of Oregon faced five misconduct charges, including an allegation of "harassment," for yelling "I hit it first" at a passing couple she did not know. Tim Cushing, *University of Oregon Slaps Student With Five Conduct Charges Over Four Words*, TECHDIRT (Aug. 28, 2014, at 12:45 ET) https://www.techdirt.com/2014/08/28/university-oregon-slaps-student-with-five-conduct-charges-over-four-words/ [https://perma.cc/A5GH-JGEJ]. Two Babson College students received harassment charges simply for waving a Trump flag on

7

Wellesley College's campus the day after the 2016 election. Bob McGovern, *Attorneys: Babson will not punish pro-Trump duo for Wellesley ride*, BOSTON HERALD (Nov. 17, 2018, at 12:00 AM ET), https://www.bostonherald.com/2016/12/19/attorneys-babson-will-not-punish-pro-trump-duo-for-wellesley-ride [https://perma.cc/MU2K-AAM4].

Nor are such controversies unknown at universities within this Circuit. In 2013, the University of Colorado-Bouder abruptly canceled Professor Patti Adler's "Deviance in U.S. Society" class, claiming it might violate the university's harassment policy. A popular course that regularly enrolled approximately 500 students, one of its long-running highlights was a lecture featuring teaching assistants who voluntarily dressed as various kinds of prostitutes to discuss their lifestyles and backgrounds as well as risks such as violence and disease. Scott Jaschik, *Too Risky for Boulder?*, INSIDE HIGHER ED (Dec. 15, 2013), https://www.insidehighered.com/news/2013/12/16/tenured-professor-boulder-says-she-being-forced-out-over-lecture-prostitution [https://perma.cc/NK8C-96MR]. But CU-Boulder's Office of Discrimination and Harassment suddenly deemed the course a "risk" to

the university, with Provost Russell Moore asserting "academic freedom does not allow faculty members to violate the University's sexual harassment policy by creating a hostile environment for their teaching assistants, or for their students attending the class." Sarah Kuta, *CU-Boulder: Patti Adler could teach deviance course again if it passes review*, DAILY CAMERA (Dec. 17, 2023, at 13:04 MST), https://www.dailycamera.com/2013/12/17/cu-boulder-patti-adler-could-teach-deviance-course-again-if-it-passes-review/ [https://perma.cc/M39C-HL62].

A faculty committee assigned to review the course quickly found no problems with the longstanding lecture. UNIVERSITY OF COLORADO BOULDER SOCIOLOGY DEPARTMENT AD HOC COMMITTEE TO REVIEW THE COURSE, REPORT - AD HOC COMMITTEE TO REVIEW DEVIANCE COURSE MATERIALS 2 (2013), https://www.scribd.com/document/194729966/REPORT-Ad-Hoc-Committee-to-Review-Deviance-Course-Materials-December-29-2013 [https://perma.cc/PZ6L-UGS3]. Yet only after activism from students as well as from FIRE, the ACLU of Colorado, the National Coalition Against Censorship, and the Student Press Law Center did CU-Boulder relent and allow Adler to return to teaching the

9

course. *Prof Returns to Class after CU 'Harassment' Claim Fails*, FIRE (Jan. 10, 2014), https://www.thefire.org/news/prof-returns-class-after-cu-harassment-claim-fails [https://perma.cc/PW7L-UN9K].

And in 2015, the University of Kansas launched an investigation into Professor Andrea Quenette for remarks during in-class discussion the day after a campus-wide forum on racial issues. Students had alleged Quenette had violated the school's Racial and Ethnic Harassment Policy by remarking during the discussion that "As a white woman I just never have seen the racism...It's not like I see 'Nigger' spray painted on walls..." Peter Bonilla, *FIRE Letter to University of Kansas*, FIRE (Feb. 3, 2016), https://www.thefire.org/research-learn/fire-letter-university-kansas-0 [https://perma.cc/Q7ZV-QMVW]. While KU ultimately concluded Quenette's clearly protected remarks had not actually violated university policy, it absurdly took four speech-chilling months to finish "investigating" and allow Quenette to return to teaching. *Victory: University of Kansas Professor Reinstated After Four-Month Investigation Into Classroom Speech*, FIRE (Mar. 21, 2016), https://www.thefire.org/news/victory-university-kansas-professor-

10

reinstated-after-four-month-investigation-classroom-speech

[https://perma.cc/7F6D-6BJA].

There is a common thread among these examples of illiberal speech-
and thought-policing on our nation's campuses: use of overbroad and
vague harassment codes to chill or punish speech that is unpopular,
unsympathetic, or simply unpalatable to those holding political power on
campus.

## II.    The Supreme Court Has Provided the Constitutional Standard for Discriminatory Harassment Policies

In *Davis v. Monroe County Bd. of Education*, the Supreme Court
defined hostile environment harassment in the educational context as
discriminatory conduct "so severe, pervasive, and objectively offensive
that it can be said to deprive the victims of access to the educational
opportunities or benefits provided by the school." 526 U.S. 629, 650
(1999).

In crafting the *Davis* standard with the precision the First
Amendment requires, the Court struck a careful balance between
protecting speech and prohibiting actionable harassment. It specifically
addressed concerns that, if it left undefined educational institutions'
responsibility to address harassment, schools would use that obligation

to justify censorship. The majority's exacting standard was therefore designed to impose what Justice O'Connor characterized as "very real limitations" on liability in part to protect student speech. *Id*. at 652.

As the only Supreme Court ruling defining discriminatory harassment in the educational context, the *Davis* standard—no more and no less—is the only permissible standard for public university discrimination policies. Courts thus use it to evaluate the constitutionality of campus policies. *See, e.g.*, *DeJohn v. Temple Univ.*, 537 F.3d 301, 318 (3d Cir. 2008). And the sexual harassment definition required by federal Title IX regulations tracks *Davis* precisely because the use of that standard comports with the First Amendment.[2] This means that all colleges need do is follow those regulations to ensure compliance with both antidiscrimination laws and the First Amendment. NMSU nevertheless failed to do so.

---

[2] "Including the Davis definition of sexual harassment for Title IX purposes as 'severe, pervasive, and objectively offensive' conduct that effectively denies a person equal educational access helps ensure that Title IX is enforced consistent with the First Amendment." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026, 30033 (May 19, 2020) (to be codified at 34 C.F.R. pt. 106).

## III.   The District Court's Attempt to Save ARP 3.25 Only Highlights Its Unconstitutionality

The District Court erred in failing to recognize that the policies NMSU used to terminate Roemer violate basic First Amendment principles. When a law or regulation would prohibit "a 'substantial amount' of constitutionally protected speech," it is unlawfully overbroad, *Kansas Judicial Review v. Stout*, 519 F.3d 1107, 1121 (10th Cir. 2008), and when such a rule or law fails to give a person of ordinary intelligence a reasonable opportunity to know what it forbids, it is void for vagueness. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Time and time again, courts nationwide have invalidated college and university harassment policies on these bases.[3]

---

[3]  *See, e.g.*, *DeJohn*, 537 F.3d at 318 (invalidating sexual harassment policy on First Amendment grounds and holding that because it failed to require speech to "objectively" create a hostile environment, it provided "no shelter for core protected speech"); *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177 (6th Cir. 1995) (declaring discriminatory harassment policy facially unconstitutional); *Roberts v. Haragan*, 346 F. Supp. 2d 853 (N.D. Tex. 2004) (finding university sexual harassment policy unconstitutionally overbroad); *Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357 (M.D. Pa. 2003) (enjoining enforcement of harassment policy due to overbreadth); *Booher v. Bd. of Regents*, 1998 U.S. Dist. LEXIS 11404 (E.D. Ky. July 22, 1998) (finding university sexual harassment policy void for vagueness and overbreadth); *Corry v. Leland Stanford Junior Univ.*, No. 740309 (Cal. Super. Ct. Feb. 27, 1995) (slip op.) (declaring "harassment by personal vilification" policy unconstitutional); *UWM*

While the District Court's opinion repeatedly ties itself in knots attempting to save both of NMSU's facially unconstitutional policies, its analysis of the university's discriminatory harassment policy, Appx. Vol. 2, at 323-345,[4] is where its faulty reasoning is at its apex. The District Court begins its consideration of NMSU Administrative Rules and Procedures Section 3.25 (ARP 3.25) with a doomed attempt to find an objectivity standard where none exists. It ends by inadvertently providing an example of how the policy, on its face, purports to allow NMSU to punish speech the First Amendment clearly protects.

### A. The District Court misunderstands the objectivity standard.

First, in attempting to read an objectivity standard into ARP 3.25 Part 3(D)3, the District Court confuses the critical question of whether expression is objectively offensive (which Plaintiff-Appellant challenges, *see* Appellant's Br. at 16-17) with the question of measuring how a person

---

*Post, Inc. v. Bd. of Regents of the Univ. of Wis. Sys.*, 774 F. Supp. 1163 (E.D. Wis. 1991) (declaring racial and discriminatory harassment policy facially unconstitutional); *Doe v. Univ. of Mich.*, 721 F. Supp. 852 (E.D. Mich. 1989) (enjoining enforcement of unconstitutional discriminatory harassment policy).

[4] Citations to "Appx. Vol. X, at XX" refer to the volume of Appellants' appendix and boxed page number at the bottom of the page.

(whether reasonable or unreasonable) was individually impacted by the alleged harassment, an issue Plaintiff-Appellant does not raise. Part 3(D)3 states:

> Conduct of a sexual nature, [sic] constitutes a violation of NMSU policy and/or law or policy when … conduct has the purpose or effect of substantially interfering with an individual's academic or work performance, or creating an intimidating, hostile and offensive environment in which to work or learn."

Appx. Vol. 2, at 327.

The District Court begins its defense of Part 3(D)3 by invoking dictionary definitions of "substantial"—*e.g.*, "considerable in quantity: significantly great"—to read an objective standard into NMSU's use of the term "substantially interfering." *Id*. at 142. But "considerable" and "significant" are themselves relative terms. The District Court's reading makes even less sense given that the other challenged policy, ARP 3.80, while unlawfully vague and overbroad for reasons Plaintiff-Appellant explains, *see* Appellant's Br. at 21-25, prefaces its functionally identical language in Part 6(C) ("significantly and adversely impacted in their ability to benefit from…educational or work opportunities") with an *explicit objective requirement* that the impact would affect a "similarly situated reasonable person." Appx. Vol. 2, at 348. The canons of statutory

construction strongly suggest that, since an explicit objective standard is present in ARP 3.80 Part 6(C), NMSU deliberately left an objectivity requirement out of the corresponding provision in ARP 3.25. *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983). Put another way, why would NMSU add an objective requirement to ARP 3.80 if, in the District Court's opinion, none was needed for ARP 3.25?

The District Court then takes its analysis in entirely the wrong direction by applying its invented "objectivity" to answer the wrong question. Attaching significance to the fact that the full phrase in Part 3(D)3 reads: "substantially interfering with an <u>individual's academic or work performance</u>," (emphasis added by the District Court), the District Court finds that "If a student alleges that 'conduct of a sexual nature' has caused them to fall behind on their assignments, to stop showing up for class, or to receive poor grades, an administrator can use these benchmarks to determine if the interference has been 'substantial.'" Appx. Vol. 2, at 331. Likewise, for a professor, "NMSU could investigate any number of objective benchmarks to make a determination as to 'substantial in[ter]ference [sic]': whether the professor skipped class;

16

missed departmental meetings; and failed to evaluate timely student work." *Id*.

Yet all these District Court-created "objective" benchmarks do is measure the magnitude of *subjective* reaction of listeners, not whether their reaction was itself reasonable. One complainant may stop attending a class because a constitutionally protected class discussion about a literary work with sexual themes like *Lolita* offended them, while another may stop attending because of a fellow classmate's repeated unprotected threats to sexually assault her. By the District Court's reckoning, *both* complainants have reached the same benchmark of objectivity: both demonstrably stopped going to class. *Id*.

## B. The District Court's own example of prohibited speech under ARP 3.25 blatantly violates the First Amendment.

The District Court goes on to inadvertently prove ARP 3.25 leaves no room for the First Amendment. It offers the following hypothetical of speech ARP 3.25 prohibits: when, "during a rehearsal of Andrew Lloyd Weber's musical *Cats*, a student repeatedly makes comments about how much he loves 'seeing all of those butts in costume.'" *Id*. at 344. The court identifies such comments as "vulgar, but that conclusion is the point," *id*.

at 345, and finds that punishing them is a not just an outlier but "heartland" application of Part 3(D)3. *Id.* The court thus confirms ARP 3.25 is a content-based restriction on speech that is "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), (*citing R.A.V. v. St. Paul*, 505 U.S. 377, 395 (1992); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115, 118 (1991)).

So does NMSU have a compelling state interest in punishing "vulgar" speech? Not even close. More than 50 years ago, the Supreme Court affirmed the right of a college student newspaper to print a political cartoon on its cover "depicting policemen raping the Statue of Liberty and the Goddess of Justice," as well as the headline "Motherfucker Acquitted," *Papish v. Board of Curators*, 410 U.S. 667, 667 (1973), holding "the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Id.* at 670. In 1993, the Fourth Circuit upheld an injunction preventing George Mason University from punishing a fraternity for its "ugly woman" contest at

which "one member dressed as an offensive caricature of a black woman … stuffed with pillows to exaggerate a woman's breasts and buttocks," *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 388 (4th Cir. 1993), observing that the First Amendment "generally prevents government from proscribing … expressive conduct because of disapproval of the ideas expressed." *Id*. at 393, (*citing R.A.V.*, 505 U.S. at 382). And just last week, the Fifth Circuit reversed a district court and halted West Texas A&M University's ban on student drag performances that the university's president attempted to justify by claiming "drag shows … discriminate against womanhood." *Spectrum WT v. Wendler*, No. 23-10994, 2025 WL 2388306, at *2 (5th Cir. Aug. 18, 2025).

Compared to these examples, all of which have sexual themes and all of which the First Amendment protects on public college campuses, the offensiveness of the District Court's lone hypothetical backside appreciator barely registers. And the sheer scope of daily expression on any campus equivalent in vulgarity or potential offense to the District Court's *Cats* example means ARP 3.25 would punish "a 'substantial

amount' of constitutionally protected speech," making it unlawfully overbroad. *Kansas Judicial Review*, 519 F. 3d at 1121.

## IV.   Facial Challenges Are Important to Ensure Government Does Not Unlawfully Chill Speech

It is no coincidence that many of the most important cases nationwide on this topic have consistently invalidated overly broad harassment policies at public colleges and universities through facial challenges.[5] The doctrine allowing for facial challenges under the First Amendment "is predicated on the sensitive nature of protected expression: 'persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions by a statute susceptible of application to protected expression.'" *New York v. Ferber*, 458 U.S. 747, 768 (1982) (citations omitted).

It is hard to imagine a more justifiable use for such challenges than ensuring that universities avoid creating the very situation of self-

---

[5] *See, e.g.*, *DeJohn v. Temple Univ.*, (upholding facial challenge to university sexual harassment policy); *Bair v. Shippensburg Univ.* (invalidating portions of student conduct code student alleged "had a chilling effect on [their] rights"); *UWM Post v. Bd. of Regents* (granting summary judgment and finding discriminatory harassment policy was unconstitutional "on its face"); *Doe v. Univ. of Mich.*, (enjoining racial harassment policy on a facial challenge), *supra* note 3.

censorship that *Ferber* describes. Indeed, the Supreme Court has repeatedly warned of the danger of chilling faculty and student speech at institutions famously labeled as "peculiarly the 'marketplace of ideas,'" *Healy v. James*, 408 U.S. 169, 180 (1972), and where "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise, our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

Courts must be willing to continue to vindicate these fundamental rights when necessary, especially because universities tend to be so insulated from public pressure and moral suasion that they see no need even to engage with those who politely ask them to make the needed changes to conform their policies to the law.

This is no mere speculation in NMSU's case, as its unwillingness to engage on this issue outside court is not theoretical. As is FIRE's regular practice with incoming college presidents, when we learned of new NMSU system president Valerio Ferme's appointment in February 2025, we wrote to congratulate him and to offer our assistance in revising NMSU policies governing expression, or to work together in a number of other ways, all "free of charge in accordance with FIRE's charitable

mission." *See* Amicus Appx. Collaborating with universities in this manner is a regular part of FIRE's work, and dozens of institutions have taken us up on offers to review their policies.

We never received a response from NMSU.

## CONCLUSION

Campus speech codes have repeatedly suffered defeat in court in an almost unbroken string of legal precedent stretching back nearly thirty years.[6] Despite the clarity of this legal precedent, use of these policies to chill and silence campus speech continues. If there is one thing a quarter-century of FIRE's advocacy in this space demonstrates, it is that any supposed risk to colleges from courts vigilantly enforcing the First Amendment pales in comparison to the long history of abuses committed by colleges that, like NMSU, blithely ignore the law when formulating policies. And like NMSU, when challenged, rather than engage with critics or simply follow the law, they spend their taxpayers' and constituents' money convincing courts to let them go on silencing the views of those very taxpayers and constituents. As long as this remains true, our federal courts must stay open to facial challenges against these

---

[6] *See supra* note 3.

policies by those few who, like Professor Roemer, have the ability, wherewithal, and courage to hold them to account under the Constitution.

Dated: August 29, 2025        /s/ *Robert Corn-Revere*

ROBERT CORN-REVERE
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@thefire.org

Counsel for *Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

1.    All required privacy redactions have been made.

2.    Any paper copies of the foregoing brief submitted to the clerk's office are exact copies of the brief as filed via ECF.

3.    This brief complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f), this document contains 4,056 words.

4.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

5.    This brief filed via ECF is free of viruses.

/s/ *Robert Corn-Revere*
ROBERT CORN-REVERE
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 29, 2025, an electronic copy of the foregoing was filed with the Clerk of this Court using the CM/ECF system, and that all parties will be served through that system.

/s/ *Robert Corn-Revere*

ROBERT CORN-REVERE
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION